# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Honorable Justin T. Quinn |
| v. | Mag. No. 25-6064 (JTQ) |
| DEVON HARRIS and ESTHER KIM | **CRIMINAL COMPLAINT** |

I, Christopher Martinelli, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

/s/ *Christopher Martinelli*
_____
Christopher Martinelli, Special Agent
Federal Bureau of Investigation

Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1(b)(2)(A)
on October 14, 2025,
in the District of New Jersey

Honorable Justin T. Quinn
United States Magistrate Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## **ATTACHMENT A**

From on or about March 8, 2025 through on or about March 21, 2025, in Mercer County, in the District of New Jersey and elsewhere, the defendants,

DEVON HARRIS and
ESTHER KIM,

knowingly and intentionally conspired and agreed with each other and others to execute a scheme and artifice to defraud Financial Institution-1, a financial institution as defined in Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain the moneys, funds, assets, and other property owned by, and under the custody and control of Financial Institution-1, by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Christopher Martinelli, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents and other items of evidence. Where statements of others are related herein, they are related in substance and part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### Background

1. At all times relevant to this Complaint:

    a. Defendant DEVON HARRIS ("HARRIS") was a resident of Mercer County, New Jersey.

    b. Defendant ESTHER KIM ("KIM") was a resident of Philadelphia, Pennsylvania.

    c. Victim-1 was a resident of California and maintained a business bank account at Financial Institution-1.

    d. Financial Institution-1 was (i) a "financial institution" as that term is defined in Title 18, United States Code, Section 20, offering, among other things, checking and savings accounts to customers, (ii) had deposits insured by the Federal Deposit Insurance Corporation ("FDIC"), and (iii) had branches in New Jersey.

### Overview of the Conspiracy

2. The object of the conspiracy was to enrich defendants HARRIS, KIM, and their co-conspirators by fraudulently withdrawing funds from Victim-1's bank account at Financial Institution-1.

3. It was part of the conspiracy that defendants HARRIS, KIM, and their co-conspirators used the stolen personal identifying information of Victim-1 in various ways to effectuate the fraudulent scheme, including by obtaining and using a fraudulent California driver's license in the name of Victim-1 but bearing KIM's photograph.

4. It was further part of the conspiracy that on or about March 21, 2025, defendant KIM, at the direction of defendant HARRIS, attempted to

withdraw approximately $200,000 in cash from Victim-1's bank account by traveling from New Jersey to a branch of Financial Institution-1 located in Anaheim, California; presenting to an employee of Financial Institution-1 a customer receipt listing Victim-1's Social Security number, Victim-1's telephone number, and the amount that KIM wished to withdrawal (*i.e.*, $200,000); and presenting to an employee of Financial Institution-1 the fraudulent California driver's license in Victim-1's name but bearing KIM's photograph.

### **Specific Acts in Furtherance of the Conspiracy**

5.  In or around February 2025, a California-based confidential source ("CS") provided information to law enforcement about defendant HARRIS's involvement in several fraudulent schemes, including defrauding financial institutions. The CS advised law enforcement that HARRIS wanted to bring several co-conspirators to California to work with the CS to defraud financial institutions. The CS had previously told HARRIS that the CS was working with an employee of an Orange County, California branch of Financial Institution-1 (the "Manager") who would assist the CS with fraudulent withdrawals of money from victims' bank accounts at Financial Institution-1. However, as the CS explained to law enforcement, the CS was not in fact working with anyone employed at Financial Institution-1.

6.  From in or around March 8, 2025 through in or around March 18, 2025, the CS, acting at the direction and supervision of the FBI, engaged in several recorded telephone communications with HARRIS regarding HARRIS's fraudulent activities and, more specifically, HARRIS's plan to send co-conspirators to California to defraud Financial Institution-1.

7.  For instance, on or about March 8, 2025, during a recorded video call between HARRIS and the CS, HARRIS stated that he would be sending a 44-year-old Korean female co-conspirator to California to conduct fraudulent withdraws of money from bank accounts belonging to other individuals, including a bank account at Financial Institution-1 belonging to Victim-1. HARRIS further stated that he had already obtained a fake identification for this female co-conspirator to use to fraudulently withdraw money from Victim-1's bank account at Financial Institution-1. HARRIS then shared with the CS a photograph of defendant KIM and identified KIM as the female co-conspirator that he would be sending to California to execute the fraudulent withdrawals at Financial Institution-1. The CS asked when HARRIS planned to send KIM out to California because the CS needed to let the Manager know what day to expect KIM to appear at Financial Institution-1. HARRIS responded, "I just gotta buy [KIM] a ticket."

8.  During a subsequent recorded video call on or about March 12, 2025, HARRIS told the CS that he (HARRIS) was attempting to obtain bank

account information belonging to other victims and planned to have KIM fraudulently obtain funds from those accounts as well:

> HARRIS: And I'm trying to find another one with an age that kinda makes sense for her [KIM]. I think I got one that's like 50. Cause I don't want them to come in there looking like too –
>
> CS: Yeah, that's what he [the Manager] say. He be like, just cause he gotta play his role too, so he don't wanna get fired. He like, just make sure they look straight.
>
> HARRIS: Nah, the age that's on there is 1967. I think that's – 1967 – that's like 50 –
>
> CS: Yeah, she [KIM] should be good then.
>
> HARRIS: – 55.
>
> CS: She should be good.
>
> HARRIS: She is already 44 years old.
>
> CS: Oh, nah, she's good.
>
> HARRIS: Exactly. So, that's why I got that one in place.
>
> \* \* \* \*
>
> CS: So, how you want to do it. So say, am I giving her [KIM] the bread, your half?
>
> HARRIS: She's green. She's handled way more than 200 grand for me before.
>
> CS: Oh, okay, okay, okay, okay. So she's good.
>
> HARRIS: Yeah, yeah, yeah. She's super green. Trust me.

9. HARRIS also told the CS that, in addition to KIM, HARRIS had other co-conspirators that he planned to send to California to execute fraudulent withdrawals of money from bank accounts belonging to other identity theft victims:

> HARRIS: Now, the Santa Claus dude, he's in Indianapolis right now –
>
> CS: Uh huh

5

HARIS:    – doing pulls with my home girl.

CS:    Okay.

HARRIS:    So, they working. I said to keep him for like a little week and then I'm gonna send him over there to Cali cause I got mad work. With my spammer, you know, the ages be older.

CS:    Yeah.

HARRIS:    So, that's, as of right now, it's looking like that and another old lady I'm a send out there. But. Damn bro. Um, as of right now, it's just that one and the other ones is a little older in age, so I do have to let him finish with my sis and then send him over to Cali, which I'm gonna try and figure out that whole situation.

CS:    Yeah.

HARRIS:    I might just have to double back a couple of times –

CS:    That's what I'm saying.

HARRIS    – because I don't want to rack up too much money over there and then I can't fly it over here.

10. In addition, HARRIS described to the CS how HARRIS purchases victims' personal and banking information from a "spammer" who sells the information to HARRIS:

HARRIS:    Nah, bro, I could give you my spammer bro, like, if you want it, like, bro the only thing that –

CS:    He taxing?

HARRIS:    – I be asking. Huh?

CS:    He taxing or not for real?

HARRIS:    Nah. People think it's taxing because n***as don't be having bread [money].

CS:    Yeah.

HARRIS:    I'm like, we got bread –

6

CS: Yeah.

HARRIS: – so it's like, bro, like, like right now he got – I tell you some shits that I would even be able, willing to hand over to you, bro. You could buy 'em and just, know what I mean, just toss me a little something. Like, I'm just going to give you, I'll give you my spammer's jawn, bro.

CS: Word.

HARRIS: He's one thousand percent legit.

\* \* \* \*

HARRIS: He [the spammer] got a [Financial Institution-1 account], 242K [meaning $242,000 in the account] –

CS: How much is that?

HARRS: – female, 1948. He want $1,400 for it.

CS: That's all?

\* \* \* \*

HARRIS: Bro, he [the spammer] sent me a pro [referring to stolen bank account information] with $1.8 million in it and he only wanted, I think, like three bands [meaning $3,000].

CS: Oh, yeah, I see that's the type of –

HARRIS: RDP, he giving it to you on RDP with, um. You know how to operate RDP, right?

CS: Nah, not for real. You gotta show me.

HARRIS: Okay. So, RDP, so look, I'm gonna tell you. So, he gives you email and log access. So, what he's gonna do is, once you pay him for the pro, he's gonna, you send it to him in Bitcoin. He gonna, once the pro, he's gonna put it on RDP. RDP is a remote desktop. So now, he's going to give you the IP address that he –

CS: Oh, oh, and I have to use it –

HARRIS:   – with the username and then you can go on there and do, adjust everything, like you're on their computer.

CS:   Oh, okay.

HARRIS:   And that's how I get onto the logs. I wait until like two, three, four in the morning when I know that these old people asleep, and when they gonna get the emails for changing their profile information. Once they get the email, in the email, I go in there and delete it. So, therefore, they don't even know they stuff is changed.

11.   During another recorded conversation on or about March 18, 2025, HARRIS informed the CS that KIM and another male co-conspirator ("CC-1") would be flying to Los Angeles, California on Friday, March 21, 2025 and should be landing at the airport at around 10:30 a.m. or 11:00 a.m. The CS told HARRIS that the Manager had already ordered approximately $200,000 in cash so that the cash would be at the branch when KIM arrived in California. The CS also told HARRIS that the CS would send HARRIS the address for Financial Institution-1 in Anaheim, California, and that the CS would meet KIM and CC-1 at Financial Institution-1 after they arrived in California. In addition, during this conversation, HARRIS told the CS that he (HARRIS) also intended to travel from New Jersey to California the same day as KIM and CC-1 (*i.e.*, Friday, March 21, 2025), but that HARRIS would not be able to "fly there" until his fiancé returned home so that she could take care of their young child.

12.   On or about March 21, 2025, at approximately 6:59 a.m. Eastern Daylight Time (EDT), KIM boarded a flight at Newark-Liberty International Airport in Newark, New Jersey and traveled to Los Angeles International Airport in Los Angeles, California, arriving at approximately 10:26 a.m. Pacific Daylight Time (PDT).

13.   Prior to meeting with KIM and CC-1 on or about March 21, 2025, the CS met with law enforcement at a predetermined location, at which time law enforcement outfitted the CS with a covert recording device. In addition, on or about March 21, 2025, law enforcement established surveillance both inside and outside of Financial Institution-1. Law enforcement also met with employees of Financial Institution-1, including the actual manager of Financial Institution-1 ("Bank Employee-1"), and informed Bank Employee-1 that KIM would be entering Financial Institution-1 to attempt to fraudulently withdraw funds from Victim-1's bank account. Law enforcement instructed Bank Employee-1 not to process KIM's request to withdraw funds from Victim-1's bank account. Thereafter, the CS drove to a particular location near Financial Institution-1 where the CS met with KIM and CC-1, who arrived in a black

Mercedes Benz SUV operated by an employee of a ride-share company (the "Mercedes").

14. A short time later, the CS communicated with HARRIS via telephone, and their conversation was captured by the CS's covert recording device. During this call, the CS told HARRIS that he was now with KIM. HARRIS advised the CS that CC-1 was going to wait in the Mercedes so the ride-share driver "don't drive away." HARRIS then instructed the CS to "give [KIM] the rundown real quick, who she looking for, you know." The CS and KIM then entered the CS's vehicle to discuss the fraud plan:

| | |
|---|---|
| KIM: | Okay, so tell me what I'm gonna need because – |
| CS: | You just got the, you got the ID? |
| KIM: | I got the ID. I got the, uh, social. I can't recall. |
| CS: | Yeah, that's all you need. So, you just need a ID and the social. He [the Manager] already ordered the cash. So, you're just gonna go in." |

\* \* \* \*

| | |
|---|---|
| KIM: | So, tell me, what's his [the Manager's] name? |
| CS: | Who? My owner? The innie? |
| KIM: | The innie. |
| CS: | Jessie. |
| KIM: | Is he expecting me? |
| CS: | Yeah, he knows you're here…. So basically, we already ordered the cash though. Did bro [HARRIS] tell you? |
| KIM: | Uh um |
| CS: | We ordered the cash. So, really, all you're going in, you're going in, you're just going to withdraw. So, the amount you're doing, cause bro wanted to do the whole 200 [meaning $200,000] that he ordered. So, the amount you're doing, they're gonna have to ask for manager approval. |
| KIM: | So, I'm not gonna [specifically] go in there and deal with the [unintelligible]. |

9

| | |
|---|---|
| CS: | You can ask for Jessie, but you gotta go through it like you gotta do a withdraw. |
| KIM: | Alright, okay, I see what you're saying. So, he knows I'm making the withdraw, so he's gonna – |
| CS: | Yeah, cause it has to get manager approval. So, basically, he's gonna come over and say "Okay." |

15. Shortly thereafter, the CS again communicated with HARRIS via telephone while the CS and KIM were still discussing the fraud plan inside the CS's vehicle. During this call, HARRIS, KIM, and the CS engaged in the following conversation:

| | |
|---|---|
| KIM: | I'm just worried that the teller gonna start asking me additional questions. |
| CS: | No, the teller's not gonna ask you no questions. |
| KIM: | Do I have a phone? Am I going in there with a phone? Do, am I gonna get – |
| CS: | You're not gonna, they're not gonna have to send no text message, they're not gonna have to send no codes, no nothing. |
| KIM: | No? |
| CS: | No, not at all. |
| KIM: | I don't have a debit card, nothing, I'm just gonna give her my social, she just gonna look it up – |
| CS: | Yeah. Bro know. Like the last time we ran, all we need is, all you need is a social and a ID. That's the point of the innie. |

\* \* \* \*

| | |
|---|---|
| HARRIS: | Just go in there and ask for the manager, and be like I'm - |
| CS: | The, the, the, the teller's not, yeah, the teller's not gonna ask for the manager. So, go to the, go to the first one, go to the first teller – |

| | |
|---|---|
| KIM: | But, what if I [unintelligible] – |
| CS: | Window one – |
| KIM: | what he said, just ask for the manager, be like, "Hey, I'm gonna make a large withdrawal today, are you, can you assist me?" |
| CS: | Yeah, cause he already ordered – |
| KIM: | I'm more comfortable dealing with the manager than the teller. |
| CS: | Yeah, he [the Manager] already ordered the cash. |
| KIM: | What's his name again? |
| CS: | Jessie. |
| HARRIS: | Once you talk to him [the Manager], just be like, "I'm here to pick up that 200 [$200,000]. |

\* \* \* \*

| | |
|---|---|
| CS: | I just pulled up to the bank, I had to [unintelligible]. |
| HARRIS: | Alright, yeah, try to make that as quick as possible because you know that lady's waiting with [CC-1] in the car. |
| CS: | So, you know everything to do, though, right?  She good? |
| KIM: | Yeah. |
| HARRIS: | Yeah.  As long as he [the Manager] good, she good. |
| CS: | He's good.  I'm just saying, just go in, "Hey, I want to do a withdrawal, I ordered cash."  Let 'em know you ordered the cash, it's $200,000, and then you basically, you wanna do the withdrawal for the $200,000. |
| HARRIS: | With the, yeah, with the manager. |
| KIM: | Hey, can you send me real quick, on the EK, um, the EIN one more time, please?  I emptied my bag so I could bring the money.  Real quick, that's all I need. |

| | |
|---|---|
| HARRIS: | [unintelligible]. |
| KIM: | Yeah, and the address, the business, and shit, everything you sent me on that other phone. Cause not, no, cause he's saying I'm gonna be dealing with a teller, I don't wanna be – |
| CS: | But you, yeah, just have all, you can have all that – |
| HARRIS: | Just go in there, you have to see the teller first. Just go in there and tell the teller you wanna see the manager because you're making a large withdrawal and that's it. And then just, he gonna come over and help you and that's it. |
| KIM: | I'm saying, at least, I want that on deck. |
| CHS: | She just want to have it on deck in case. |
| HARRIS: | I get it. I'm sending it. |
| KIM: | I know you gave it to me already, but I emptied my bag so I could put money in it. |
| HARRIS: | Alright, alright, alright. |
| KIM: | Thank you. |
| CS: | What time is it? It's going to be smooth. Quick too cause I definitely, uh, I got to pick my peoples up from the airport still. |
| HARRIS: | Alright, look, I just sent it to you. |
| KIM: | Okay. |
| HARRIS: | Go look. You got it? |
| KIM: | Yes. |
| HARRIS: | There's the last four of each account number, obviously you can see which one have the most in it. It's out of the business account. |
| KIM: | Okay, bye. I'm going in. |

16. KIM then entered Financial Institution-1 and stood in line at the teller counter for several minutes waiting to speak with a teller. While inside

Financial Institution-1, KIM periodically communicated via text message with both HARRIS and the CS. A few minutes later, KIM approached the teller and asked to speak with the Manager. Shortly thereafter, Employee-1 came over to the teller window to assist KIM. KIM then falsely identified herself as Victim-1 by presenting Employee-1 with the fake California driver's license in Victim-1's name but bearing KIM's photograph. KIM also provided Employee-1 with a customer receipt listing Victim-1's Social Security number, Victim-1's telephone number, and the amount that KIM wished to withdrawal (*i.e.*, $200,000). Thereafter, at Employee-1's request, KIM sat down in the waiting area.

17.     While waiting for KIM to complete the fraudulent withdrawal, HARRIS engaged in another recorded conversation with the CS via telephone. During their conversation, the CS told HARRIS that the CS needed to leave the area to pick up some associates at another location and inquired as to whether HARRIS trusted KIM and CC-1 with the approximately $200,000 in cash that KIM was supposed to fraudulently withdraw from Victim-1's bank account. HARRIS responded that he trusted KIM and CC-1 "one million percent." As to KIM, HARRIS explained, "I have the key to her house. Her car is parked here at my crib. And she's handled countless pulls [fraudulent bank withdrawals] for me and be hounding me down to bring the bread [money]."

18.     Later during the same call, the CS and HARRIS engaged in the following conversation:

> CS:     Yo. What's shortie [KIM] doing?
>
> HARRIS:     What do you mean?
>
> CS:     N***a, the innie [the Manager] just texted me.
>
> HARRIS:     And what did he say?
>
> CS:     He said your girl [KIM] needs to go to the teller, she's fucking up. He just texted me, swear. He said your girl needs to go to the teller, she's fucking up. What is she doing? She's gonna, he [the Manager] said she burnt out. What is she doing? Oh my God, bro, do I have to pull back up?
>
> HARRIS:     I think she was trying to look for the phone number, then she found it.

\* \* \* \*

> HARRIS:     She [KIM] said there's nobody named Jessie in there.

| | |
|---|---|
| CS: | Yes it is. |
| HARRIS: | She said that, she texted me [unintelligible]. |
| CS: | His name is Jessie, man. |
| HARRIS: | I mean, bro, she's [KIM] texting in the chat right now. . . . "[Bank Employee-1] help me. Sent the teller away to help me. Who's [Bank Employee-1]?" |
| CS: | Hold on. |
| HARRIS: | He might of told you his name was Jessie. |
| CS: | Yeah, it's [Bank Employee-1], he Spanish, yeah. |

\* \* \* \*

| | |
|---|---|
| HARRIS: | Okay, but is she at the right spot? |
| CS: | Nah, yeah, she, yeah, look, that's what he said. |
| HARRIS: | Oh, oh, you just got the names mixed up. |
| CS: | Yeah, that was my fault. |

\* \* \* \*

| | |
|---|---|
| HARRIS: | He's [Bank Employee-1] still waiting for approval. What approval is he waiting for? |
| CS: | Yeah, I'm talking to the innie [the Manager] right now. |
| HARRIS: | What he saying? |
| CS: | I just texted him. I just said, "What approval are y'all waiting for?" |
| HARRIS: | I mean, he obviously pulled up the account already, right? |
| CS: | Yeah, exactly. For sure. |
| HARRIS: | I hope he don't gotta call it. Ahh, like, n\*\*\*a, just give 'em the – |
| CS: | That's what I'm saying – |

14

      HARRIS:    Just give 'em the fucking bread [money], bro.

    19.    Later in the conversation, the CS told HARRIS that the Manager informed the CS that KIM needed a four-digit personal identification number ("PIN") code to be able to withdraw the funds from Victim-1's bank account. HARRIS responded, "I don't know what that shit is bro." The CS also advised HARRIS that the Manager suggested that KIM leave the bank now because KIM was "looking burnt."

    20.    Shortly thereafter, KIM exited Financial Institution-1 without the fraudulent California driver's license, which was still in Employee-1's possession. KIM walked back to the location where CC-1 was waiting for her in the Mercedes, entered the Mercedes, and she and CC-1 departed the area.

    21.    Employee-1 provided law enforcement with the fraudulent California driver's license bearing KIM's photograph and the client receipt that KIM had presented to Employee-1 while inside Financial Institution-1.

    22.    Law enforcement subsequently interviewed Victim-1, who advised law enforcement that she had not authorized anyone to withdraw money from her bank account on or about March 21, 2025. Victim-1 further advised law enforcement that she had not authorized anyone to use her name, date of birth, social security number, or address on or about March 21, 2025.